**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
SHAWN GAINES,

                         **Plaintiff,**                            **<u>OPINION AND ORDER</u>**

       **-against-**                                   **04 CV 5238 (NG) (LB)**

**NEW YORK CITY TRANSIT AUTHORITY,**

                         **Defendants.**
-----------------------------------------------------------------X
SHAWN GAINES,

                         **Plaintiff,**

       **-against-**                                   **06 CV 5867 (NG) (LB)**

**TRANSPORT WORKERS UNION OF**
**GREATER NY-AFL-CIO LOCAL 100,**

                         **Defendants.**
-----------------------------------------------------------------X

**GERSHON, United States District Judge:**

      Plaintiff *pro se* Shawn Gaines brings two actions: one against defendant New York City

Transit Authority ("TA") alleging employment discrimination and retaliation in violation of the

Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq.; the other against

defendant Transport Workers Union of America, Local 100 ("Local 100") alleging retaliation in

violation of the ADA.  Both the TA and Local 100 now seek summary judgment dismissing all of

Mr. Gaines' claims.

      Because these actions arise from interrelated facts and circumstances, this Opinion and Order

addresses both summary judgment motions.  For the reasons set forth below, defendants' motions

are granted in their entirety.

**FACTS**

Unless otherwise indicated, the facts set forth below are undisputed.

Plaintiff Shawn Gaines began working for the TA in 1984. Initially hired as a conductor, he became a train operator approximately 27 months into his employment. From 1999 until termination, Mr. Gaines has been permanently medically restricted because of a hearing problem. As a result of this problem, Mr. Gaines was restricted to "yard work only" duty and was required to wear bilateral hearing aids. A "yard only" restriction means the restricted employee may work only in the confines of the yard. The medical department considered "yard only" the equivalent of "nonpassenger service." The medical department determines whether employees need certain medical restrictions; management determines what jobs are available to restricted employees. The TA believed the safety risk posed by Mr. Gaines' hearing problem would be minimized by restricting him to nonpassenger status. Mr. Gaines does not contest the restriction.

As a train operator for the TA, Mr. Gaines is represented by Local 100 and is subject to a collective bargaining agreement ("CBA") between the TA and Local 100. Pursuant to the CBA, train operators semi-annually, in the order of seniority, pick work assignments (including location), regular days off, and scheduled vacation. From 1999 until his termination, Mr. Gaines picked the 239th Street Yard because he was allowed to operate trains there, albeit in the yard only, where passengers are not present. The TA's Superintendent for the 2 Line, Louis Brusati, testified that Mr. Gaines told him that, during this period, in spite of his medical restriction, Mr. Gaines on occasion drove trains to the main line "as a favor to superintendents."

On July 19, 2004, following an altercation with his dispatcher, Mr. Gaines was suspended upon disciplinary charges unrelated to the claims presented here. Under the CBA, which covers

terms and conditions of employment, an employee can file a grievance against the TA if the employee disagrees with disciplinary action taken against him. The CBA provides for arbitration before a neutral arbitrator as the final step.

On September 30, 2004, Local 100 represented Mr. Gaines at the arbitration at which the TA sought his termination. On October 15, 2004, an arbitrator found nearly all the TA's disciplinary charges unsupported by evidence and that the correct remedy was a written warning, not dismissal. The arbitrator ordered the TA to reinstate Mr. Gaines to the position he held immediately prior to his suspension and give him back pay. Mr. Gaines returned to work on October 19, 2004, at which time, pursuant to the CBA, he was directed to report to the TA Medical Assessment Center ("MAC") for a return-to-work physical.

Meanwhile, on October 1, 2004, prior to the issuance of the arbitration award, Rapid Transit Operations, which operates the 239th Street Train Yard, issued a memorandum via email stating it would no longer employ train operators with "yard only" or "no main line" restrictions because, going forward, all train operators would be required to drive to the mainline where passengers are present. Train operators who were deemed no longer able to safely operate trains in passenger service were thus precluded from working at the 239th Street Train Yard. The October 1, 2004 policy change was originally proposed in early 2004.

At the time of this policy change, the 239th Street yard at which Mr. Gaines worked employed six train operators. Mr. Gaines was the only one with a "yard only" medical restriction. Therefore, Mr. Gaines was the only employee affected by the policy change.

When Mr. Gaines reported to the MAC on October 19, 2004, he failed to bring his hearing aids. He was physically examined, given a work restriction of "not to operate any Transit Vehicle,"

and ordered to return the next day with his hearing aids. After returning on October 20, 2004 with his hearing aids, Mr. Gaines' restriction was modified to "no passenger service, yard work only" – the same restriction he had prior to his July 19, 2004 suspension. The TA instructed Mr. Gaines to return on November 18, 2004 with an aided audiogram (hearing test administered with the use of a hearing aid). Mr. Gaines failed to appear on November 18, 2004. On January 4, 2005, Mr. Gaines appeared at the MAC with an aided audiogram for only his right ear. On January 10, 2005, Mr. Gaines obtained an aided audiogram for both ears; whether he provided this report to the TA is in dispute. The audiogram revealed Mr. Gaines "did not show significant benefit obtained from" the use of his hearing aids.

Meanwhile, on November 1, 2004, the TA requested that Mr. Gaines report for a reclassification examination on November 5, 2004. The purpose of a reclassification examination is to determine whether an employee, previously found to have a permanent medical restriction preventing him from performing the essential functions of his job, meets the medical requirements for another position into which he could be placed. A train operator can be reclassified to the titles of station agent, property protection agent, or cleaner. Under the CBA, individuals employed by the TA for ten years or more continue to receive the same rate of pay to which they would be entitled in their pre-reclassification position if, as is generally the case, the new position has a lower rate of pay. Mr. Gaines failed to appear for scheduled reclassification examinations on November 5, 2004, November 30, 2004, and December 14, 2004. Mr. Gaines has yet to appear for a reclassification examination. On at least one occasion, December 23, 2004, Mr. Gaines sent a letter to the TA requesting the medical basis on which his reclassification was purportedly necessary.

On January 13, 2005, Local 100 applied to the arbitrator for clarification of the October 15,

2004 decision. Local 100 argued the TA had not complied with the arbitrator's ruling because it failed to reinstate Mr. Gaines to the position held immediately prior to suspension. The TA countered that it had complied. The Arbitrator held she lacked jurisdiction to hear the dispute since she retained jurisdiction over the case for 90 days for the purpose of clarifying the award, not to resolve compliance disputes. Def. Exh. S.

On or about March 15, 2005, Local 100 filed a petition under New York Civil Practice Law and Rules Article 75 with the Supreme Court of the State of New York, New York County, to confirm the arbitration award and obtain an order requiring the TA to restore Mr. Gaines to his former position as train operator. Justice William A. Wetzel held that the TA had complied with the arbitration award, noting that "Petitioner fails to realize that reinstatement is subject to all other CBA conditions, including submission to required physical examinations and, if necessary, reclassification." *In re Touissaint*, Index No. 103738/05, at 4-5 (Sup. Ct. N.Y. Co., July 19, 2005). Justice Wetzel wrote, "[i]t would violate both logic and equity for this court to create an exception for Mr. Gaines whereby he would not fall subject to the TA's October 1, 2004 policy change." *Id.* at 4.

On August 18, 2005, to obtain reinstatement of Mr. Gaines to his former position as train operator, Local 100 filed a contract interpretation grievance with the TA on Mr. Gaines' behalf. As per CBA grievance procedures, a Step I hearing was held on September 9, 2005, resulting in the denial of Mr. Gaines' grievance. A Step II hearing was scheduled for September 13, 2005. However, Mr. Gaines failed to appear. Therefore, on September 21, 2005, the date on which his arbitration was scheduled to be heard, the arbitrator remanded the case for a Step II hearing, which is required before Step III arbitration may be held. On September 27, 2005, a Step II hearing was

held, and the denial of Mr. Gaines' grievance was upheld. Arbitration of Mr. Gaines' grievance was then scheduled for October 7, 2005.

On October 7, 2005, however, the TA took an adjournment. The CBA does not limit the number of adjournments either party can take, nor does it require a party to give a reason for seeking an adjournment. Local 100 does not have the power to prevent the TA from adjourning. Mr. Gaines' grievance was then rescheduled for October 21, 2005.

On October 21, 2005, Local 100 and the TA met with the arbitrator and held informal, off-the-record discussions designed to narrow the issues as well as further settlement negotiations. However, because these discussions occurred late in the day, the arbitrator adjourned the formal hearing to November 16, 2005.

On November 16, 2005, the arbitration of Mr. Gaines' grievance formally commenced. After opening statements, however, the TA requested an adjournment, indicating that it was not prepared to proceed further. The arbitration was rescheduled for December 22, 2005.

On December 22, 2005, all arbitrations between Local 100 and the TA were cancelled because of a transit strike. The arbitration was rescheduled for January 5, 2006.

On January 5, 2006, Local 100 requested an adjournment because Local 100's counsel was not prepared to go forward; this was based on a recent lack of communication between him and Mr. Gaines. The arbitration was rescheduled for January 26, 2006.

On January 26, 2006, the TA again took an adjournment for unspecified reasons. The arbitration was rescheduled for April 27, 2006.

On April 27, 2006, the TA and Local 100 agreed to adjourn the entire contract arbitration calendar consisting of six separate grievances. Full-calendar adjournments typically occur when it

appears unlikely that most of the matters scheduled for that day will be heard. Matters often appear unlikely to be heard as a result of the likelihood of settlement, the impending withdrawal of a grievance, or the inability of a party to proceed. Sometime in April, 2006, plaintiff ceased communicating with Local 100.

Meanwhile, on March 18, 2005, Mr. Gaines filed a charge with the EEOC in which he alleged that the TA committed disability discrimination and unlawful retaliation by seeking to reclassify him to a new position despite his ability to perform his job "with no problem." Mr. Gaines also alleged the TA retaliated against him for receiving a favorable opinion from the arbitrator. The EEOC issued a right-to-sue letter on September 2, 2005. Thus, when Mr. Gaines commenced this lawsuit against the TA on December 4, 2004, the EEOC had yet to issue a right-to-sue letter. However, at an October 6, 2005 status conference before Magistrate Judge Bloom, Mr. Gaines was allowed to amend his complaint by appending the right-to-sue letter.

Still refusing reclassification, Mr. Gaines was terminated on October 19, 2005 because he had "been unable to perform the duties of [his] position due to a [n]on-service injury / illness since 10/19/04." Def. Exh. I. On July 26, 2006, Mr. Gaines obtained a right-to-sue letter from the EEOC authorizing the current lawsuit against Local 100.

### Mr. Gaines' Medical History

Medical records maintained by the TA indicate that, as early as March 30, 1990, Mr. Gaines suffered from "significant hearing loss." Pl. Exh. M. at 1. A letter from Doctor Mauro L. Ruffy indicates that Mr. Gaines was being treated "for sensori-neural hearing loss bilateral permement (sic) and acute sinusitis." Id. at 2. On August 13, 1991, the TA Medical Services Department assessed Mr. Gaines as suffering from "[p]rofound mixed hearing loss bilat." Id. at 3. A letter to the TA

from Doctor Cecil D. Grimes, Jr. dated December 18, 1991, indicates that Dr. Grimes found "moderately severe to severe" hearing loss. Id. at 9. Further, Dr. Grimes indicates the TA provided him with a

> "Job profile" which lists the duties and requirements of train operator. Under item 7 it states that, "Good hearing is required to hear radio and P.A. anouncements (sic)." Unquestionably Mr. Gaines would have to be disqualified on [that] basis . . . .

Id. at 10. On August 20, 1999, Doctor Robert M. Lerch found that Mr. Gaines suffered from "significant sensorineural hearing loss in the right ear." Id. at 11.

On July 11, 2000, a memorandum from Doctor E. Isenberg at the MAC to Doctor Cassandra Clarke-Belgrave[1] indicates that Mr. Gaines requested a "field test to demonstrate that he meets Medical Standards with hearing aids." Id. at 17. Dr. Isenberg wrote that Mr. Gaines "does not meet hearing standards unless it can be shown that [he] can function well in actual job environment wearing hearing aids." Id. at 17. The Medical Department denied Mr. Gaines' request because

> Over the last 10 years, results of [Mr. Gaines'] hearing tests (audiometric) vary considerably from time to time. Transit consultants and employee's own physicians cannot fully explain this fluctuation. Therefore, even if [Mr. Gaines] were to pass a field test testing hearing on any given day, there is no assurance he could meet standards on any other day.

Id. Dr. Isenberg also noted, "[i]n the past when approved for restricted duty with hearing aids, he has not always worn hearing aids. Lost hearing aids 2/8/99 but did not report this to Medical Department until 9/2/99." Id.

In a letter dated August 18, 2000, to Doctor Maurice H. Miller requesting an independent examination of Mr. Gaines, Dr. Clarke-Belgrave noted Mr. Gaines' "prior history of fluctuating

---

[1] Medical Director of TA, Office of Occupational Health Services.

ability to hear" and that "[p]ublic safety is at risk if a Train Operator is not able to hear well." Id. at 18. In his response dated September 13, 2000, Dr. Miller wrote, "[the] enormous quantity of audiometric and audiologic data [provided to me by the TA] show a pattern of inconsistent fluctuating hearing loss." Id. at 24. Dr. Miller found hearing loss in Mr. Gaines' right ear "of moderately severe degree." Id. at 26. Notwithstanding the use of hearing aids, Mr. Gaines demonstrated a "reduced ability to understand speech in a background of noise when the speech stimulus is presented to the [right] ear." Id. at 27. In a medical assessment conducted by the TA Medical Services Department on July 11, 2001, the TA found that Mr. Gaines "can't drive a train." Id. at 36. However, in a similar examination conducted on August 29, 2001, the TA found that Mr. Gaines "[m]ust wear Hearing Aids while operating a train." Id. at 40. On November 8, 2001, Mr. Gaines was found to "[m]eet[] TA standards for current title and work status." Id. at 30. In other words, as of November 8, 2001, Mr. Gaines was medically fit to be a "yard only" train operator, as defined by TA policy then in place. He was not authorized to drive to the mainline. Examination reports reveal that Mr. Gaines' hearing aids only sometimes improve his hearing; other times, they do not. Clarke-Belgrave Depo. at 19. Mr. Gaines states that his hearing aids work sufficiently well that he can function as a train operator under restriction. Gaines Depo. at 78.

## The Instant Actions

On December 4, 2004, Mr. Gaines commenced suit against the TA in this court alleging the TA discriminated against him by no longer allowing him to work as a train operator and that the TA retaliated against him for receiving a favorable opinion from the arbitrator. On October 25, 2006, Mr. Gaines commenced suit against Local 100 in this court alleging it retaliated against him for filing a disability discrimination charge against the TA.

## DISCUSSION

## I.    Standard of Review

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. P. 56(c). A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must construe the facts in the light most favorable to the nonmoving party and all reasonable inferences and ambiguities must be resolved against the moving party. *Flanigan v. GE*, 242 F.3d 78, 83 (2d Cir. 2001). Nevertheless, the nonmoving party cannot rest on "mere allegations or denials" but must instead "set forth specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Harlen Associates v. Incorporated Village of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) (speculation and conjecture is insufficient to preclude summary judgment).

Although the moving defendant bears the burden of showing that no genuine factual dispute exists, the non-moving plaintiff must make a sufficient showing on the essential elements of his case for which he bears the burden of proof at trial. *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 884 (1990); *Celotex*, 477 U.S. at 323. "Where no such showing is made, the moving party is entitled to judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." *Lujan*, 497 U.S. at 884 (internal quotation marks and citations omitted).

District courts must be cautious when granting summary judgment in employment

discrimination cases because the employer's intent is often at issue. *See Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994). However, summary judgment may still be appropriate "even in the fact-intensive context of discrimination cases." *Abdu Brisson v. Delta Airlines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001). To defeat a motion for summary judgment, the nonmoving party "must provide more than conclusory allegations of discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997). There is no genuine issue of material fact for trial unless sufficient evidence in the record exists favoring the party opposing summary judgment to support a jury verdict in that party's favor. *Anderson,* 477 U.S. at 249-50. "[I]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.*

## II.       The TA's Motion For Summary Judgment

## A.       Disability Discrimination

Plaintiff claims the TA discriminated against him by virtue of the allegedly pretextual October 1, 2004 policy change, which rendered him medically unqualified for his position and subject to reclassification. Defendant argues that plaintiff fails to establish a prima facie case because he is neither disabled within the meaning of the ADA, nor can he perform the essential functions of his job. The court finds that, even if plaintiff can establish a prima facie case of discrimination, he has failed to present evidence from which a reasonable jury could conclude that the TA's actions were motivated by anything other than legitimate safety concerns.

The ADA prohibits discrimination against any "qualified individual with a disability." 42 U.S.C. § 12112(a). For claims of disability discrimination, courts apply the three-step burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *Heyman v. Queens Village Committee for Mental Health*, 198 F.3d 68, 72 (2d Cir. 1999). First, the

plaintiff must establish a prima facie case. *Id.* The burden of production then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions. *Id.* To prevail, the plaintiff must then demonstrate that the proffered reason is pretext for intentional discrimination. *Id.* The burden of persuasion is at all times on the plaintiff. A reason cannot be "pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) ("it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation"). At the summary judgment stage, this means that the plaintiff "must establish a genuine issue of material fact either through direct, statistical or circumstantial evidence as to whether the employer's reason for discharging her is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision." *Gallo*, 22 F.3d at 1225.

For a prima facie case of disability discrimination, a plaintiff must show that (1) his employer is subject to the ADA; (2) he suffers a disability within the meaning of the ADA; (3) he is otherwise qualified to perform the essential functions of the position, with or without reasonable accommodation; and (4) he suffered an adverse employment action because of his disability. *Giordano v. City of New York*, 274 F.3d 740, 747 (2d Cir. 2001).

### 1.      Disability Under the ADA

The ADA defines "disability" as either: (A) a physical or mental impairment that substantially limits one or more of an individual's major life activities; (B) a record of such impairment; or (C) being regarded as having such impairment. 42 U.S.C. § 12102(2); *Sutton v. United Air Lines*, 527 U.S. 471, 478 (1999). Congress did not intend to extend the protections of

the ADA to all people with physical or mental impairments. *See Toyota Motor v. Williams*, 534 U.S. 184, 197 (2002) (Congress intended to "create a demanding standard for qualifying as disabled" under the ADA). A limitation is substantial if a person is "significantly restricted as to the condition, manner or duration under which [he] can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity." *Reeves v. Johnson Controls World Servs.*, 140 F.3d 144, 150 (2d Cir. 1998) (internal quotation omitted), citing 29 C.F.R. § 1630.2(j)(1)(i). The ADA requires "that the impairment . . . be significant and not merely trivial." *Id.* at 51. "Whether a person has a disability under the ADA is an individualized," fact-specific inquiry. *Sutton*, 527 U.S. at 483. Courts consider the nature and severity of the impairment, the impairment's duration, and the permanent or long-term impact resulting from the impairment. *See* 29 C.F.R. § 1630.2(j)(2).

Under 42 U.S.C. § 12102 (2)(C) ("regarded as disabled"), the decisive issue is the employer's perception of the employee's alleged impairment. *Giordano*, 274 F.3d at 748. To prevail under § 12102(2)(C), an employee must demonstrate not only that his employer "regarded him as somehow disabled, but that [it] regarded him as disabled within the meaning of the ADA." *Id.* (internal brackets and quotations omitted).

In the instant case, the record reveals two impairments that may serve as disabilities under the ADA: working and hearing. *See* 29 C.F.R. § 1630.2(i) (major life activities include "walking, seeing, hearing, speaking, breathing, learning, and working"). The TA argues that plaintiff is not substantially limited in either of these major life activities.

a.      **Working**

To demonstrate that he is substantially limited in the major life activity of working, plaintiff

must show that his impairment disqualifies him from either a particular class of jobs or a broad range of jobs in various classes, as compared to a non-impaired person of similar training, skill, and experience. *Giordano*, 274 F.3d at 750, citing 29 C.F.R. § 1630.2(j)(3)(i). Only if plaintiff is substantially limited in his ability to work generally is he disabled under the ADA.

Plaintiff cannot rely on the major life activity of working to defeat defendant's motion for summary judgment because his hearing impairment does not preclude him from a broad class of jobs. Defendant has identified several specific jobs within the TA for which plaintiff is qualified: station agent, property protection agent, and cleaner. Indeed, plaintiff does not argue that he is substantially limited in his ability to work generally.

Neither is plaintiff regarded by the TA as substantially limited in his ability to work. An employee can be "regarded as" disabled in two ways: "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Sutton*, 527 U.S. at 489. Neither scenario applies here. The evidence demonstrates that the TA does not regard plaintiff as substantially limited in the major life activity of working because the TA does not consider plaintiff unable to perform a broad class of jobs; it acknowledges he is qualified to be a station agent, property protection agent, and cleaner. No evidence indicates the TA regards plaintiff as unable to perform any job other than those in which a hearing problem presents a safety risk.

In sum, plaintiff fails to produce evidence from which a reasonable jury could find him substantially limited in the major life activity of working, that he has a record thereof, or is regarded as such. Therefore, he cannot rely on the major life activity of working to support his prima facie

case.

### b.    Hearing

Plaintiff claims he is substantially limited in the major life activity of hearing.  The TA does not contest that Mr. Gaines suffers from a hearing impairment.  It does, however, argue that Mr. Gaines' use of hearing aids minimizes this impairment and that, as a result, he is not disabled for purposes of the ADA.  The TA further argues that Mr. Gaines' representation that he is capable of operating a train indicates that he does not consider himself significantly impaired.

As described above, medical records maintained by the TA reveal that plaintiff has a long history of at least moderately severe hearing loss in his right ear.  The TA's Medical Services Department described Mr. Gaines' hearing loss as "profound."  Even the arbitrator before whom Mr. Gaines' disciplinary proceeding was held noted in her opinion that "Gaines' hearing difficulties were evident at the proceeding."  Pl. Exh. A at 3, fn. 1.  While the determination of whether an individual is substantially limited in a major life activity "should be made with reference to measures that mitigate the individual's impairment," *Sutton*, 527 U.S. at 475, evidence indicates that Mr. Gaines' hearing aids provide him with only minimally better hearing.  In sum, Mr. Gaines has produced evidence from which a reasonable jury could conclude that, notwithstanding use of hearing aids, he is substantially limited in the major life activity of hearing.  *See, e.g., Bosket v. Long Island Railroad*, 2004 U.S. Dist. LEXIS 10851, *16-17 (E.D.N.Y.  June 4, 2004); *Wilson v. Aetna Life and Casualty Co.*, 195 F. Supp. 2d 419, 429 (W.D.N.Y. 2002).

### 2.    The Remaining Elements of Plaintiff's Prima Facie Case

The TA does not dispute its status as an employer subject to the ADA.  Further, because Mr. Gaines for several years performed the job for which the TA's October 1, 2004 policy change

rendered him medically unqualified, and because no evidence indicates his hearing has deteriorated further since then, the court will treat Mr. Gaines as meeting the minimal standard required to make his prima facie case with regard to whether he is qualified for the job. *See Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001) ("Although the defendant did properly offer up its dissatisfaction with [plaintiff's] work performance as its legitimate business reason for discharge, there is no basis for the district court's conclusion that [plaintiff] lacked even minimal qualification for a job whose duties he had been performing for seven years."). Finally, loss of seniority can be an adverse employment action. *See Pimentel v. City of New York*, 2002 U.S. Dist. LEXIS 8454, *15 (S.D.N.Y. 2002) ("[W]here there is no loss of salary, benefits, seniority, tenure or promotion opportunities, there is no adverse employment action."); *Clarke v. One Source Facility Servs.*, 168 F. Supp. 2d 91, 99 (S.D.N.Y. 2001) (adverse action included, *inter alia*, a seniority demotion).

### 3. The TA's Legitimate Non-Discriminatory Reason

Defendant argues the TA changed the medical requirements for train operators assigned to the yard in the interests of public safety and that doing so is consistent with the ADA.

The Court of Appeals for the Second Circuit has explained that the "[TA] has a statutory responsibility to operate the transit system for the safety of the public." *Shannon v. New York City Transit Authority*, 332 F.3d 95, 103 (2d Cir. 2003) (internal quotation omitted); *see also* N.Y. Pub. Auth. L. § 1204 (describing powers of TA). The TA may make employment decisions based on consideration of the public interest. *Id.,* citing *New York City Transit Auth. v Transp. Workers Union*, 220 A.D.2d 749 (2d Dep't 1995) ("Requiring [the TA] to reinstate an employee who has been found to be a threat to public safety is contrary to public policy and to the [TA's] statutory

responsibility to operate the transit system for the safety of the public."). In *Shannon*, the Second Circuit held that "[n]o reasonable jury could find that [the TA] exceeded the broad bounds necessarily afforded it under the ADA to decide as an employer whether color vision is an essential qualification for driving a [TA] bus." *Shannon*, 332 F.3d at 103.

In this case, the TA's October 1, 2004 policy change sought to enhance transit system safety in two ways: with regard to customer safety, by ensuring that no train operator with a medical restriction could drive to the mainline where customers may be present; and, with regard to employee safety, by precluding medically restricted operators from intra-yard train operation. Indeed, the deposition testimony of several TA officials demonstrates the TA's awareness of dangers posed by plaintiff's hearing problem.[2]

Plaintiff urges the court to look no further than his several years of incident-free train operation, since which time his hearing has allegedly not deteriorated further, as evidence that the TA's policy change provides no benefit to public safety and that it therefore must be pretextual. While evidence of this history helps him establish the "essential functions" element of his prima facie case, it fails to raise an issue of fact as to whether the TA's proffered non-discriminatory reason is false and whether it is more likely that a discriminatory reason motivated the TA's policy

---

[2] *See, e.g.,* Brusati Depo. at 37-38 (Plaintiff's "tak[ing] trains to the main line . . . was in jeopardy of not only his own safety, but the safety of other employees and customers."), 62 ("If [Mr. Gaines was] moving a train, and someone shouted to [him] to stop because . . . someone might be under the train performing a job function, or working on the trackway, and [he] didn't hear the message to stop, [he] would continue moving the train, therefore causing injury or possible death to that employee."); Clarke-Belgrave Depo. at 11 ("if another co-worker is attempting to speak to [Mr. Gaines], or get [his] attention immediately, and [his] hearing deficit interferes . . . , there is a risk that[,] especially if the co-worker is trying to warn about a hazardous condition or give caution, or say to stop immediately, and [Mr. Gaines does]n't hear . . . what has been said, that is problematic and has consequences, which could be great, to the [TA].").

change.  Indeed, acceptance of this argument would limit the TA's ability to make safety-oriented improvements in medical and operational policy.

Based upon all the facts, no reasonable jury could find that the TA's attempt to reclassify plaintiff was motivated by anything other than legitimate safety concerns.  Therefore, the TA's motion for summary judgment with respect to plaintiff's discrimination claim is granted.[3]

## B.     Retaliation

Plaintiff alleges that the TA's October 1, 2004 policy change was effected to retaliate against him for receiving a favorable result in the arbitration of his disciplinary charges.  Since he was the only employee at the 239th Street yard under restriction, he appears to be the only employee immediately affected by the change.  Defendant moves for summary judgment on the ground that, assuming the TA did retaliate as alleged, retaliation for asserting disciplinary grievance rights under a collective bargaining agreement between the employee's union and the employer is not actionable under the ADA.  In its reply papers, the TA alternatively argues that plaintiff can identify no retaliatory action because the TA fully complied with the arbitration award and, in addition, the TA changed its policy two weeks prior to the issuance of the arbitration award.

The *McDonnell Douglas* framework applies to retaliation claims under the ADA.

---

[3] Assuming plaintiff could otherwise articulate a claim of failure to accommodate, such claim would fail as a result of plaintiff's lack of cooperation in the reclassification process.  A plaintiff who thwarts the accommodation process cannot later claim failure to accommodate. *See Thompson v. City of New York*, 2002 U.S. Dist. LEXIS 23675, *26 (S.D.N.Y.  December 6, 2002) (no failure to accommodate where, because plaintiff refused to provide necessary medical information, "defendants were not in a position to even offer, let alone refuse, a reasonable accommodation"); *see also Jackan v. New York State Dep't of Labor*, 205 F.3d 562, 566 (2d Cir. 2000) (ADA contemplates that both sides will "work together to assess whether an employee's disability can be reasonably accommodated.").

*Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001) ("We analyze a retaliation claim under the ADA using the same framework employed in Title VII cases."). To establish a prima facie case of retaliation under the ADA, plaintiff must demonstrate that (1) he engaged in protected activity; (2) defendant was aware of this activity; (3) defendant took adverse action against him; and (4) a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action. *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 177 (2d Cir. 2006).

Assuming this claim is actionable under the ADA and that plaintiff could demonstrate a prima facie case of retaliation, this claim suffers from the same infirmity as his discrimination claim: on the entire record, there is insufficient evidence from which a reasonable jury could conclude that the TA's October 1, 2004 policy change was animated by a retaliatory motive. The change in policy that precluded plaintiff from his former position is not disputed and its enactment is fully supported by the safety considerations proffered by the TA. *See Shannon*, 332 F.3d at 103. There is no evidence, aside from plaintiff's conclusory allegations, that defendant changed its policy to retaliate against him. Speculation, standing alone, is insufficient to raise an issue of fact. *Harlen Associates v. Incorporated Village of Mineola*, 273 F.3d 494, 502 (2d Cir. 2001) ("[Defendant's] claims are wholly speculative and, therefore, . . . summary judgment properly was granted.").

Because no reasonable jury could conclude that the TA acted with a discriminatory purpose when it enacted the October 1, 2004 policy change, the TA's motion for summary judgment with respect to plaintiff's retaliation claim is granted.

### III.    Local 100's Motion For Summary Judgment

Plaintiff alleges that Local 100 retaliated against him for bringing a disability discrimination

charge against the TA. Local 100 moves for summary judgment on the ground that he fails to identify a protected activity, adverse union action, or retaliatory motive.

A union may be liable for retaliation in violation of the ADA. *See* 42 U.S.C. § 12203(a) ("No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]."); 42 U.S.C. § 12111(7) ("The term[] 'person' . . . shall have the same meaning given such terms in . . . [42 U.S.C. 2000e]."); 42 U.S.C. § 2000e(a) ("The term 'person' includes . . . labor unions").

To establish a claim of retaliation against Local 100, plaintiff must show that he participated in a protected activity of which defendant was aware, and that he suffered an adverse union action as a result, i.e., that there was a causal connection between plaintiff's protected activity and the union's action. *See Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 443 (2d Cir. 1999).

Plaintiff engaged in protected activity under the ADA when he filed an EEOC charge and lawsuit against the TA. *Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir. 1991) (complaint against employer constitutes protected activity in retaliation claim against union). It is undisputed that Local 100 knew of these activities. "Proof of the causal connection can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." *Manoharan v. Columbia Univ. College of Physicians and Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988); *see also Johnson*, 931 F.2d at 208 ("simply because [plaintiff] filed his original charge against [the employer] and not against the union does not breach the causal connection"). Here, however, no reasonable

jury could find adverse action or a causal connection between the alleged action and plaintiff's protected activity.

Plaintiff argues that Local 100 took adverse action against him when it adjourned, or acquiesced in the adjournment of, his arbitration hearing on eight occasions between September 21, 2005, and April 27, 2006. Local 100 responds that a delay in processing a member's grievance cannot constitute an adverse action. Even if it could, Local 100 argues, the delay of plaintiff's arbitration cannot be attributed to Local 100 action.

"An adverse employment action may be found where a plaintiff is deprived of the ability to expeditiously ascertain and enforce his rights under [a] collective bargaining agreement with his employer." *Johnson, 931 F.2d at 207* (internal quotations omitted). In determining whether adverse union action exists, the court is mindful of the standards enunciated in *Vaca v. Sipes*, 386 U.S. 171 (1967), with regard to a union's duty of fair representation, which obligates it to represent fairly all employees subject to the collective bargaining agreement. *Vaca*, 386 U.S. at 177; *see Nweke v. Prudential Ins. Co. of Am.*, 25 F. Supp. 2d 203, 231 (S.D.N.Y. 1998) (adverse union action may be found where a union breaches its duty of fair representation). To be a violation of this duty, "[t]he union's conduct must, first, have been arbitrary, discriminatory or in bad faith, and second, it must have seriously undermined the arbitral process." *Barr v. United Parcel Serv., Inc.*, 868 F.2d 36, 43 (2d Cir. 1989), citing *Vaca*, 386 U.S. at 190, and *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 567 (1976).

Plaintiff cannot establish that Local 100 breached its duty of fair representation. The undisputed evidence indicates that only one adjournment resulted from the action of Local 100. All other adjournments were either requested by the TA, the result of plaintiff's own conduct, or

attributable to circumstances unrelated to plaintiff's grievance. Thus, the action of which plaintiff complains is, in substantial part, not union action.

Even if all adjournments resulted from union action, plaintiff produces no evidence that Local 100 acted with bad faith when it requested an adjournment on January 5, 2005, or when it acquiesced to the adjournment requests of the TA or the arbitrator. The uncontradicted evidence provided by Local 100 indicates that the delay in processing plaintiff's grievance was commonplace.[4] While the multiple adjournments may have caused plaintiff inconvenience, any assertion that they had a negative impact on plaintiff's employment would be pure speculation since his grievance was never finally arbitrated, the result of plaintiff's apparent decision to abandon the arbitration process and pursue the current action against Local 100. Indeed, as the uncontradicted evidence indicates, Local 100 did not undermine the arbitral process; plaintiff did. Further, he produces no evidence that the delay in processing his complaint was abnormal, or that other union members' grievances were processed more promptly than his. In sum, no evidence indicates that Local 100's representation of plaintiff was irrational or unreasonable.

Moreover, a union's failure to pursue a grievance in the manner preferable to the grievant, in the absence of bad faith, is not a breach of the duty of fair representation. *See Mazza v. District Council of New York, et al.*, 2007 U.S. Dist. LEXIS 65965, *34-35 (E.D.N.Y. September 5, 2007) (claim that union's prosecution of back pay grievance was "not aggressive enough, not fast enough, and that [plaintiff] was not kept sufficiently informed along the way" is not a breach without evidence of bad faith); *Hands v. DaimlerChrysler Corp.*, 2005 U.S. Dist. LEXIS 15568, *13-15 (D.

---

[4]Local 100 identifies nine other Local 100 members whose contract interpretation arbitrations were adjourned on more occasions than was plaintiff's, as well as a tenth whose case was adjourned seven times but took two and a half years to resolve.

Ohio July 29, 2005) (because no evidence indicated the union acted in bad faith, no breach where union took two years to process grievance); *Armstrong v. Chrysler Corp.*, 972 F. Supp. 1085, 1090 (D. Mich. 1997) (same); *Bellesfield v. RCA Comm., Inc.*, 675 F. Supp. 952, 958 (D.N.J. 1987) (union's year-long delay in processing plaintiff's wage adjustment grievance not evidence of bad faith).

Finally, plaintiff produces no evidence of improper retaliatory motive. At his deposition, plaintiff stated only that Local 100 sought to punish him for refusing to accept the union's advice to accept reclassification at the TA while his grievance remained pending, not that Local 100 acted in retaliation for his filing a charge against the TA.[5] Nor does he produce evidence from which a retaliatory motive may be inferred. To the contrary, the record indicates that Local 100 made several efforts to have plaintiff reinstated to his former position: it successfully represented him at his September 30, 2004 discipline proceeding; it filed a N.Y.C.P.L.R. Article 75 proceeding in New York State Supreme Court; and it filed the contract interpretation grievance against the TA, the adjournments of which gave rise to plaintiff's lawsuit against Local 100.

In sum, no evidence indicates that Local 100 "deprived [plaintiff of] the ability to expeditiously ascertain and enforce his rights under [the] collective bargaining agreement with [the TA]," *Johnson, 931 F.2d at 207*, nor did Local 100 violate its duty of fair representation. No

---

[5] The relevant portion of the deposition transcript is as follows:

Local 100:    You believe that the union was unhappy with you because you did not agree to accept a reclassification while your grievance was pending; is that it?
Mr. Gaines:  Yes.

Deposition of Shawn Gaines, at 9.

reasonable jury could find either adverse union action or that Local 100 was motivated by an improper retaliatory motive.

## CONCLUSION

For the reasons set forth above, the motions for summary judgment filed by the TA and TWU are granted. The Clerk of Court is directed to enter judgment for the defendant in each case.

**SO ORDERED.**

　　　　　　　　　　　　　　_/S/ Nina Gershon_　
**NINA GERSHON**
**United States District Judge**

Dated:  December 18, 2007
　　　　Brooklyn, New York